### 50203. McGINTY v. THE STATE.

WEBB, Judge.

Ronald McGinty was indicted for violations of the Uniform Narcotic Drug Act (Code Ann. Ch. 79A-8). Count 1 of the indictment charged that on November 21, 1973, defendant "did unlawfully sell heroin . . . to Valjene Holmes in that Ronald McGinty was a party to said sale in that he did advise, encourage, hire, procure, aid and abet Lovett Williams in making said sale to Valjene Holmes . . ." Count 2 alleged that on the same date McGinty "did advise, encourage, hire, procure, aid and abet John Mack Reed" in selling cocaine to Holmes, the undercover agent. Defendant was convicted of both counts, and he now appeals. *Held:*

1. Criminal Code Ann. § 26-801 provides, so far as pertinent here, that a person is a party to a crime if he "(3)

intentionally aids or abets in the commission of the crime; or (4) intentionally advises, encourages, hires, counsels, or procures another to commit the crime." "Section 26-801 of the Criminal Code of Georgia defines parties to a crime and provides that every person concerned in the commission of a crime is a party thereto and may be charged and convicted of the commission of the crime. Insofar as is material to this case, that section provides that a person is concerned in the commission of a crime if he intentionally aids or abets in the commission of the crime, or advises, encourages, hires, counsels or procures another to commit the crime. While this Code section does not use the word 'conspiracy' it is plain that it embodies the theory of conspiracy insofar as it renders one not directly involved in the commission of a crime responsible as a party thereto." *Scott v. State,* 229 Ga. 541, 544 (192 SE2d 367). The existence of a conspiracy may appear from "direct proof, or by inference, as a deduction from conduct, which discloses a common design on the part of the persons charged to act together for the accomplishment of the unlawful purpose." *Lumpkin v. State,* 176 Ga. 446, 449 (168 SE 241).

There is no evidence in the record here that defendant was directly involved in the sale of drugs to Holmes by Williams and Reed on November 21, and the question before us on the general grounds of the motion for new trial is whether the circumstantial evidence is sufficient to support the conviction. The record reveals that undercover agent Holmes had made purchases of drugs from some 17 persons over a period of approximately one and one-half months, involving approximately 100 individual transactions. According to Holmes the majority of these persons "were involved in this particular group there from 755 Neal Street." It appears that this house was owned by defendant's mother, and there was evidence, although conflicting, that defendant "stayed there." Defendant admitted at trial that he had given the police and his bondsman the house at 755 Neal Street as his home address, and there was evidence that he paid the utility bills and kept his clothes there.

According to the state's evidence, the circumstances

leading up to the events of November 21 are as follows: On November 13, Holmes went to the house on Neal Street, told defendant that he had talked to defendant's brother Charles about the purchase of drugs and that he wanted to talk to defendant about purchasing large quantities of heroin, and was told by defendant that "they didn't have anything right then, for me to come back the next morning." The next day Holmes returned to the house with defendant's brother Charles and was told to wait in the car while Charles discussed the price of the heroin with defendant. Charles returned, confirmed the price, took the money from Holmes into the house and returned in a few minutes with the heroin. At this time Holmes saw defendant "peeping out the doorway."

The following day Holmes returned to the house and purchased heroin from Darryl Brown. Holmes had previously talked to several people about this transaction, including Charles McGinty and Lovett Williams, and assumed that Brown knew about it, which proved to be correct. During the transaction with Brown, defendant appeared from another room and told Brown to turn the light on so he could see what he was doing. At this time defendant asked Holmes if he wanted to purchase some cocaine, whereupon Holmes and defendant had a discussion as to the quantity, quality, and price of the cocaine. According to Holmes, "He offered to sell me one spoon of coke for three hundred and fifty dollars and he told me that it would include two spoons of cut." Holmes did not have enough money to purchase the cocaine after the purchase of heroin from Brown, and he told defendant that "I had to square with my halves," that he had regular customers just like defendant did and that he might come back and get the cocaine later.

The next day, November 16, Holmes returned to the house and purchased heroin from Lovett Williams. Holmes testified that "After we had finished our transaction, I asked him about the cocaine that I had talked to [defendant] about the previous day." Williams "knew exactly" what Holmes was talking about, repeated defendant's previous offer, and was told that Holmes would talk to him about it later and would probably purchase it.

On November 19, Holmes again went to the house and was told by Williams and John Mack Reed that there was no heroin available but that they had a limited amount of cocaine. Reed sold Holmes "three quarter teas" of cocaine. Defendant was present on this occasion, and Holmes testified that defendant was close enough to overhear the conversation. On November 20 Holmes returned to the house and purchased heroin and cocaine from Williams, but on this occasion no one else was present.

On November 21 Holmes went to the house at approximately 11:30 a.m. and purchased heroin and cocaine from Williams and Reed with bills whose serial numbers had been recorded by Holmes. Defendant was not present at the time, but when a search warrant was executed at the house at approximately 5:00 that afternoon, all the money used in the transaction was found folded over with a rubber band around it between the mattress and the springs of a bed where defendant had been sleeping in a sleeping gown. The officers executing the warrant testified that defendant claimed the money belonged to him, and asked if there were any way he could get it back, and that "He said something. He had gotten a large quantity of that money that day. He had cashed a check, cashed a check or something of this nature and he had — during that time, he had asked Lieutenant Weber, stated while I was there to Lieutenant Weber, he says, 'That is my money. You can't just take it away from here.'"

Defendant sought at trial to explain away the possession of the recorded bills by testimony that defendant's brother had given him the money approximately one week before the 21st to meet the brother's payroll on the 22nd, that he had taken the money when he left on a rabbit-hunting trip at approximately 5:00 a.m. the morning of the 21st, that the money had gotten wet and he had spread it on the bed to dry when he returned to the house around 3:30 p.m.

It is our conclusion that this evidence was sufficient to authorize the verdict. One of the most damaging circumstances is that the recorded bills used in the transactions on the 21st were recovered at 755 Neal Street where the transactions had taken place approximately

five and one-half hours earlier and were claimed by defendant as being his. Defendant's explanation of receiving the money from his brother and taking it hunting at 5:00 a.m. on the 21st may have seemed quite unsatisfactory to the jury since the marked bills did not pass to Williams and Reed until the 21st, a week after defendant said his brother had given him the money, and even on that date did not pass until long after the time defendant claimed he had gone hunting.

An inference of fact arises from recent possession of fruits of a crime, as for example in theft cases where the rule is that "The possession of recently stolen goods, unaccounted for, raises an inference that the possessor is the one who stole the goods, and if the accused does not want this inference to arise in his case, he must account for his possession." *Aiken v. State,* 226 Ga. 840, 844 (178 SE2d 202) and cases cited. The charge approved in *Aiken* was as follows: "I charge you that if the crime of robbery, or crimes of robbery should have been committed as charged in this bill of indictment, and certain personal property as set forth in the bill of indictment was stolen as a result of such crime, and if recently thereafter the defendant should be found in possession of the stolen property, or any of the stolen property, that would be a circumstance, along with all the other evidence adduced, from which the jury may infer guilt as to the particular counts in the indictment which charges the theft of that particular property, if you see fit to do so, unless, of course, the defendant should make an explanation of his possession of the stolen property consistent with his plea of innocence which, again, is a question for you, the jury, to determine." In the course of the opinion the Supreme Court stated: "The possession of any of the stolen property certainly has a rational connection with the commission of the crime of robbery, and it is for the jury to determine, under all the facts and circumstances developed at the trial, whether an inference of guilt might arise under the evidence." *Aiken,* supra, p. 845.

It is our view that these rules are analogous here and that it was for the jury to determine whether an inference of guilt might arise from defendant's claim of ownership of the recorded bills, taking into consideration his

unsatisfactory explanation of possession of the bills, together with all the other facts and circumstances developed at trial from which it could be inferred that defendant, Williams, Reed and others were acting together in a common design to sell drugs. Cf. *Gee v. State,* 130 Ga. App. 634 (204 SE2d 329); *Dutton v. State,* 228 Ga. 850, 854 (5) (188 SE2d 794); *Merino v. State,* 230 Ga. 604, 605 (2) (198 SE2d 311).

Enumerations of error 1 and 3 are without merit.

2. Enumeration of error 2 complains that the court erred in denying defendant's motion for continuance since counsel had obtained a leave of absence. However, this enumeration is without merit since counsel addressed a letter to the court stating that he did not insist upon the entire term of the leave and would appear and try the case at the time it was called up. No harm befell defendant, and no abuse of discretion appears. *Dutton v. State,* 228 Ga. 850, 851 (2), supra, and cits.

3. Enumeration of error 4 complains that "The trial court erred in admitting the testimony of witness R. L. Shelnutt because of surprise to the defense." At trial Terry Mills, a forensic chemist with the State Crime Laboratory, testified that he did not have in his possession the cocaine introduced as state's exhibits 5 and 6 because it had been introduced in evidence in another court when John Mack Reed was tried. This was not known to the district attorney until the lunch hour, and at that time it became necessary to locate the evidence. R. L. Shelnutt, court reporter for another judge, was then called to testify that he had taken possession of the drugs after the Reed trial and had kept them until the instant trial. Upon objection to Shelnutt's testimony, the court stated: "I think it is appropriate for [the district attorney] to speak to the objection you made. You can make a statement in your place." The district attorney then stated the circumstances to show that the evidence was newly discovered, and this statement authorized the use of this witness. Code Ann. § 27-1403; *Butler v. State,* 226 Ga. 56, 58 (4) (172 SE2d 399); *Mitchell v. State,* 226 Ga. 450 (3) (175 SE2d 545); *Scott v. State,* 230 Ga. 413, 414 (1) (197 SE2d 338); *Moye v. State,* 129 Ga. App. 52, 53 (1) (198 SE2d 514). See also *Yeomans v. State,* 229 Ga. 488, 489 (1)

(192 SE2d 362).

4. In enumeration of error 5, defendant contends that expert witness Terry Mills from the State Crime Laboratory should not have been allowed to testify as to the indentity of the drugs because another chemist, Alvin Sage, performed the analysis of the drugs. Defendant, in support of this enumeration pursuant to Rule 18(c, 3), this court, states that the objections forming the basis of this enumeration appear at pages 91 and 123 of the transcript. Page 91 reveals an objection to "further testimony until a proper foundation is made," and page 123 reveals a motion made at the conclusion of Mills' testimony to strike it in its entirety. While Sage performed the tests on the heroin, Mills himself performed the analysis of the cocaine, and the en bloc objection was properly overruled. "[U]nder established rules where an objection goes to the whole of evidence, if any part of it is admissible the objection should be overruled. *Gully v. State,* 116 Ga. 527, 533 (42 SE 790); *Clarke v. State,* 221 Ga. 206, 214 (144 SE2d 90)." *Hart v. State,* 227 Ga. 171, 172 (179 SE2d 346).

5. Enumeration of error 6 complains that the court erred in refusing to allow defendant to cross examine agent Holmes with reference to chronic absenteeism from a prior job with a steel company. This matter was completely irrelevant, and it was not error to limit the cross examination to relevant matter. *Childers v. State,* 130 Ga. App. 555, 561 (6) (203 SE2d 874).

*Judgment affirmed. Bell, C. J., and Marshall, J., concur.*

SUBMITTED FEBRUARY 3, 1975 — DECIDED MARCH 11, 1975 — REHEARING DENIED MARCH 31, 1975.

*Trauner, King & Cohen, Kevin S. King, Cohen, Traub & Mackin, Darryl B. Cohen,* for appellant.

*Lewis R. Slaton, District Attorney, Carole E. Wall, Joseph J. Drolet, Isaac Jenrette, Assistant District Attorneys,* for appellee.